SHAWN N. ANDERSON
United States Attorney
STEPHEN F. LEON GUERRERO
Assistant U.S. Attorney
MARIE L. MILLER
Special Assistant U.S. Attorney
Sirena Plaza, Suite 500
Hernan Cortez Avenue
Hagatna, Guam 96910
PHONE: (671) 472-7332
FAX: (671) 472-7215

Attorneys for the United States of America

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff<br>vs.<br>JOHN D. WALKER aka JON WALKER,<br>Defendant. | CRIMINAL CASE NO. 18-00010<br><br>**UNITED STATES' MOTION FOR UPWARD DEPARTURE** |

COMES NOW, the United States of America, by and through undersigned counsel, and herein respectfully files this Motion for Upward Departure as to Defendant John D. Walker aka Jon Walker ("Walker").

## I. INTRODUCTION

The Government respectfully requests the Court to impose a fair and just punishment that adequately reflects the incredible scope, scale, and duration of Walker's criminality, including 1) the 10 deaths resulting from Walker's scheme; 2) the eight (8) serious bodily injuries resulting from Walker's scheme; 3) Walker's over 30 years of ongoing criminal activity; and 4) the use of international jurisdictions to avoid detection and enforcement; the total amount of loss attributable to the scheme; the danger to the public; the obstruction of the Federal Aviation Administration's

("FAA") function; and his leadership and control of the scheme. Applying the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") and Title 18 U.S.C. § 3553(a) factors to Walker's criminality, a sentence of life imprisonment is warranted and justified.

## II. LEGAL STANDARDS

### A. Upward Departures Under U.S.S.G. §§ 4A1.3, 5K2.1, and 5K2.2

A sentencing court may depart upward from the applicable Guidelines range when death results from a defendant's criminal conduct. *See* U.S.S.G. § 5K2.1. While loss of life does not automatically trigger an upward departure, the U.S.S.G. instruct that a substantial increase may be appropriate if the death was *knowingly risked* or if the underlying offense, including fraud, was one for which base offense levels do not reflect an allowance for the risk of personal injury. *See id.* Both are present here. The relevant question is "whether it was reasonably foreseeable, given the inherently dangerous nature" of a defendant's conduct that a death would occur. *United States v. Montgomery*, 550 F.3d 1229, 1236 (10th Cir. 2008); *see also, United States v. Fitch*, 659 F.3d 788, 798–99 (9th Cir. 2011);[1] *United States v. Vernier*, 152 Fed. App'x 827, 835 (11th Cir. 2005);[2] *United States v. Mayle*, 334 F.3d 552, 563–65 (6th Cir. 2003);[3] *United States v. Diaz*, 285 F.3d 92, 100–101 (1st Cir. 2002);[4] *United States v. Scheetz*, 293 F.3d 175, 189–92 (4th Cir. 2002);[5] and

---

[1] Upholding upward departure where defendant's uncharged murder of his wife was a reasonable basis to increase sentence for bank fraud, money laundering, and other financial crimes.

[2] Approving upward departure where defendant killed victim and fraudulently used their credit card.

[3] Affirming upward departure resulting in an increase from 15 to 21 months to 292 to 365 months for a conviction for mail fraud where the underlying conduct involved three deaths.

[4] Brandishing a firearm at a crowd of bystanders, prompting police to shoot a plainclothes officer who refused to drop his weapon, was an indirect cause of the officer's death and within the scope of § 5K2.1: "[u]nintended consequences are often the result of reckless behavior…[he] should have foreseen the possibility of serious harm."

[5] Although not a direct cause of an unrelated third party's death and perhaps defendant "could not have anticipated the particular sequence of events," he "should have foreseen the possibility of serious physical harm … as a result of his actions."

*United States v. Rivalta*, 892 F.2d 223, 224–26 (2d Cir. 1989).[6]

Similarly, "if significant physical injury resulted, the court may increase the sentence above the authorized guideline range." U.S.S.G. § 5K2.2. The Ninth Circuit determined that "a 'significant' physical injury must be something more... than the ordinary scratches, scrapes and bruises that a person would suffer in almost any minor scuffle." *United States v. Singleton*, 917 F.2d 411, 413–14 (9th Cir. 1990). The text of U.S.S.G. § 5K2.2 reflects this understanding, suggesting that the extent of the increase should depend on the extent of the injury, the degree to which it may prove permanent, and the extent to which the injury was knowingly risked. *Id*.

Furthermore, a sentencing court may also apply an upward departure "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes[.]" U.S.S.G. § 4A1.3(a)(1). Federal courts and U.S.S.G. policy statements are in broad agreement that unpunished violations of law, as well as post-offense, pre-trial/pre-sentence criminal conduct of a defendant, establishes a reasonable basis for upward departure in the criminal history category under § 4A1.3. *See, e.g.*, *United States v. Myers*, 41 F.3d 531, 534 (9th Cir. 1994).[7]

**B. Role of 18 U.S.C. §3553(a) Factors**

After determining the applicable Guidelines range, including any departures, a district court must determine an appropriate sentence in light of the factors listed in 18 U.S.C. § 3553(a), while addressing any relevant arguments offered by the parties. *See, e.g.*, *United States v. Ressam*, 679 F.3d 1069, 1089 (9th Cir. 2012) (citing *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008)). Title 18 U.S.C. § 3553(a) requires a sentencing court to consider (1) "the nature and

---

[6] Upholding upward departure imposing the statutory maximum, finding that a criminal conviction for the sale and transportation of stolen property resulted in the death of the owner of the property.

[7] "[W]e … hold that U.S.S.G. § 4A1.3 constitutes legal authority for a district court to depart upward in imposing a sentence, based on a defendant's post-offense criminal conduct."

circumstances of the offense;" (2) the "history and characteristics of the defendant;" (3) the need for the sentence in light of the seriousness of the offense, promoting respect for the law, and providing for just punishment; (4) the need for the sentence to afford adequate deterrence; (5) the need for the sentence to protect the public; (6) the need to avoid unwarranted sentencing disparities; and (7) the prospect for rehabilitation. *United States v. Thompson*, 130 F.4th 1158, 1164 (9th Cir. 2025) (*citing United States v. Autery*, 555 F.3d 864, 873–78 (9th Cir. 2009)). "The district court need not tick off each of the § 3553(a) factors to show that it has considered them." *Carty*, 520 F.3d at 992.

### C. *Apprendi* and its Progeny are Inapplicable Here

The statutory maximum applicable to Walker is life imprisonment due to his conviction on Count 10 (18 U.S.C. § 38) in the Second Superseding Indictment ("SSI"), and the accompanying jury determination that his fraud was the proximate cause of a malfunction that resulted in death. *See* ECF No. 1784. The U.S. Probation Office's Guidelines calculation has Walker at an offense level 41 with no criminal history, and an exposure to 324-405 months for Count 99 with a statutory maximum of 30 years. Whether the counts are considered grouped, or the sentence imposed concurrently, depends on the court's consideration of this motion and applicable law. *Apprendi* and its progeny do not bar the imposition of a life sentence here; and the Constitution does not bar consideration of the factors discussed herein and in the Government's Sentencing Memorandum.

## III. ARGUMENT - WALKER'S CONDUCT WARRANTS LIFE VIA UPWARD DEPARTURES UNDER U.S.S.G. §§ 4A1.3, 5K2.1, AND 5K2.2, AND APPLICATION OF 18 U.S.C § 3553

### A. The Deaths and Serious Bodily Injuries Caused by Walker's Conduct Support Upward Departures Under U.S.S.G. §§ 5K2.1 and 5K2.2

This Court is empowered to "increase the sentence above the authorized guideline range" (324-405 months) if either *death or significant physical injury resulted* from the defendant's

criminal conduct. U.S.S.G. §§ 5K2.1, 5K2.2 (emphasis applied). As set out above, the relevant question during the prospective application of U.S.S.G. § 5K2.1 is whether it was reasonably foreseeable, given the inherently dangerous nature of the defendant's conduct, that a death would occur.[8] *See, e.g.*, *Montgomery*, 550 F.3d at 1236; *Diaz*, 285 F.3d at 100–101; *Scheetz*, 293 F.3d at 189–92.

Not only was it foreseeable that death and serious bodily injury would occur - Walker *knew* that his *modus operandi* would result in death and serious bodily injury. The FAA regulations Walker circumvented were specifically designed to ensure that helicopters remained airworthy, not crashing while in operation. To state the obvious: when a critical malfunction cripples a helicopter, it does not glide - it plummets. Even non-aviators understand this simple concept. Walker, who has been in the aviation business for more than three decades, knew the importance of FAA regulations and what would result from their violation. "We might also say (honestly) that the FAA and ATO [Philippine aviation authorities] have found out what is happening and are going to bust us." G-0001 (Walker email to co-conspirator).

Walker had a front row seat to the results of his criminal acts time and again: parts failing, helicopters falling, and people dying. Over and over, more than three dozen times, Walker's aircraft crashed, and many of those crashes were fatal. *See* G-1242. It was not only reasonably foreseeable that use of counterfeit parts in previously damaged or destroyed helicopters operated by uncertificated airmen could lead to fatal crashes, it was known. *See, .e.g.*, G-0001 ("Being as all of the fishing companies are aware of the latest fatality"). Yet at no point did he change his *modus operandi* to avoid future accidents or deaths. After every death Walker continued his criminal scheme, and he continued to put human lives in unsafe, unairworthy helicopters.

---

[8] Specific intent to kill is not required for the application of U.S.S.G. § 5K2.1.

Walker's actions required extensive planning and preparation, and directly undermined public trust in aviation safety. A year after Walker started purchasing previously destroyed and damaged helicopters, and using uncertificated pilots and mechanics, the first fatal crash occurred, and crashes continued almost every single year forward – totaling 38 that the FAA discovered, and an unknown number that will never be counted because Walker (illegally) stopped reporting them.[9] Profit came first, well ahead of human lives.

Based solely upon the deaths caused by Walker's conduct, this Court should apply an upward departure to impose a sentence of life imprisonment consistent with the statutory maximum in 18 U.S.C. § 38. Although the Court limited the number of deaths admitted at trial to one, the evidence shows there were actually 10 caused by the use of unairworthy helicopters (G-1247; G-0204) and uncertified mechanics (G-1248). Expert Jeff Guzzetti prepared a summary chart identifying, through his exhaustive search of National Transportation Safety Board ("NTSB') records, dozens of accidents, many of which resulted in serious bodily injury or death. G-1242. Most importantly, in every single case the airmen were uncertificated. ECF No. 1890 at 353. The following persons died as a direct result of Walker:

| Name | Position | Age | Nationality | NTSB Case # | Date |
|---|---|---|---|---|---|
| Jong Yun-Guk | Observer | Unkn. | South Korea | LAX93LA166 | 3/24/1993 |
| Thomas Koch | Pilot | 37 | USA | LAX94LA322 | 8/15/1994 |
| Benjamin Rosagazo | Pilot | 45 | USA | LAX96LA111 | 1/29/1996 |
| Ryland Jones | Pilot | 33 | USA | LAX96LA315 | 8/26/1996 |
| Ferdinand Fabelinia | Pilot | 49 | Philippines | WPR09LA069 | 12/28/2008 |
| Jimmy D. Santos | Observer | Unkn. | Philippines | WPR10LA464 | 9/11/2010 |
| Shuiyao Wang | Observer | Unkn. | China | WPR13LA137 | 3/2/2013 |
| Rafael A. Cruz Santos | Pilot | 57 | El Salvador | WPR15LA257 | 9/3/2015 |
| Kazuya Hiratsuka | Observer | 39 | Japan | WPR17LA075 | 2/22/2017 |
| Disdado Lumanlan[10] | Pilot | 59 | Philippines | N/A (CAAP jurisdiction) | 8/16/2022 |

[9] *See, e.g.*, ECF No. 1892 at 496, 499, 505.

[10] This accident and death occurred during trial and should be considered as a relevant factor at sentencing. *See* 18 U.S.C. § 3661.

Not even an indictment changed Walker's behavior. Fatal helicopter crashes continued to happen post-indictment, and the last of these while Walker was quite literally on trial killed Disdado Lumanlan. Exhibit 1 - PSC_001173, Accidents PSC.[11] *See* D-123; G-0204; G-1252; G-3053; PSC_000488.[12]

Serious physical injury is another permissible basis for upward departure under U.S.S.G. § 5K2.2 to the statutory maximum. As the Ninth Circuit observed in *Singleton*, a "significant physical injury" under § 5K2.2 is "something more than the ordinary scratches, scrapes and bruises that a person would suffer in almost any minor scuffle," 917 F.2d at 413–14, and in *United States v. Sablan*, the Ninth Circuit affirmed a district court's decision to depart upward due to significant injuries, 114 F.3d 913, 918 (9th Cir. 1997), finding the court's conclusions regarding the victims' numbness and pain, need to have surgery, and continuing maladies constituted a basis for upward departure. *Id.*

Here, the injuries suffered by Walker's victims were significant. One of Walker's pilots suffered a broken back — specifically, a 60% fracture of his L1 vertebrae — which resulted in debilitating pain and required surgery to correct. He was hospitalized for several weeks. G-0108. But he was not alone. At least five more serious bodily injuries occurred due to Walker's malfeasance. *See* Exhibit 2 – NTSB Report 1 – LAX97LA218; Exhibit 3 – NTSB Report 2 - WPR09LA069; Exhibit 4 – NTSB Report 3 - WPR13LA137; Exhibit 5 – NTSB Report 4 - WPR15LA257; and Exhibit 6 – NTSB Report 5 - WPR17LA075. Additionally, on August 16, 2022, two additional serious injuries occurred (cited *supra*, crash that occurred during trial). The

[11] Available at: https://www.ainonline.com/aviation-news/general-aviation/2022-08-17/another-fatal-crash-hansen-helo-trial-resumes.

[12] This aircraft is identified in the SSI as having an uncertificated FAA mechanic assigned to it. In addition, former pilot Tom Bustos testified at trial about an accident he was in with that aircraft, in which it was substantially damaged, and Walker personally flew out to the tuna boat to attempt to repair it. *See* ECF No. 2024 at 21, 29–30.

quantity, seriousness, and significance of these injuries more than suffice to justify an upward departure under U.S.S.G. § 5K2.2 to life.

**B. Walker's Unpunished/Uncharged/Continuing Criminal Activity Supports an Upward Departure Under U.S.S.G. § 4A1.3**

An upward departure is also authorized "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes[.]" U.S.S.G. § 4A1.3(a)(1).[13] In departing from the otherwise applicable criminal history category under this U.S.S.G. and policy statement, a court must specify in writing the specific reasons why the applicable criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes. U.S.S.G. § 4A1.3; *United States v. Connelly*, 156 F.3d 978, 984 (9th Cir. 1998); *Myers*, 41 F.3d at 534.

An upward departure is appropriate where: 1) there exists prior similar misconduct established by a civil adjudication or by a *failure to comply with an administrative order*; 2) the defendant was *pending trial or sentencing on another charge at the time of the instant offense*; and 3) *similar adult criminal conduct not resulting in a conviction*. U.S.S.G. § 4A1.3(a)(2)(C), (D) & (E) (emphasis added); *United States v. Bolt*, 782 F.3d 388, 392 (8th Cir. 2015) (affirming upward departure for similar criminal conduct which did not result in convictions); *United States v. Robertson*, 568 F.3d 1203, 1211–13 (10th Cir. 2009) (same); *United States v. Grubbs*, 585 F.3d 793, 804 (4th Cir. 2009) (noting defendant's 20 year history of child molestation and "[c]ontinued

[13] The court shall determine the extent of a departure under this subsection by using, as a reference, the criminal history category applicable to defendant whose criminal history or likelihood to recidivate most closely resembles that of the defendant's. For example, if defendant's prior behavior amounted to a felony, i.e., his sentence, if convicted, would have exceeded one year and one month, the court should add three (3) points per felony. U.S.S.G. § 4A1.1.

predatory conduct" in continuing the abuse after being under investigation); *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) (noting defendant was a "serial violator" with respect to his numerous unprosecuted illegal re-entry offenses).

In Walker's case, all three instances apply. First, prior similar misconduct established by a failure to comply with an administrative order (the FAA issued numerous Emergency Orders of Revocation of Certificates, Walker surrendered them, and then continued to operate the aircraft subject to the Order illegally);[14] pending trial and pre-sentence criminal conduct (Walker merely moved his operations to the Philippines and continued to use the same aircraft, airmen, and leases);[15] and similar criminal conduct not resulting in a conviction[16] (Walker committed numerous uncharged felony offenses in his 30-year scheme) – none of which have been considered in the PSR, including immigration fraud, tax fraud, and money laundering post-conviction (cited *infra*).

Upward departure is also justified purely on the basis of Walker's likelihood of recidivism, and the Ninth Circuit articulated three principal factors to apply in assessing it: "1) the quantity (or 'repetitiveness') of uncounted criminal conduct, 2) the similarity of uncounted criminal conduct to the offense conduct, and 3) the degree to which the defendant has been deterred by prior sentences." *Connelly*, 156 F.3d at 985. Application of these factors to Walker's post-offense

---

[14] G-1845; G-0369; G-1502-1504; G-1506-1507; G-1514; G-1410-36; G-1417-27; G-1180; G-0275; G-1412-97 G-0672; D-115; G-0813; G-1252; G-1246; G-0918.

[15] The Government had to file a civil action against Walker to try to cease the illegal operations, which continues through today. *United States v. Walker et al.*, Civil Case No. 1:23-cv-00002. *See* G-3003; PSC_001572 (Walker loaning money to the Philippine members for their "loyalty"); PSC_001696 ($10,000,000 in profits 2022, $5,000,000 for "helicopters"); PSC_000034; 51; 215 (examples of leases signed by PSC); Exhibit 7 – PSC_000488-001062, "Sale" of fraudulent helicopters from various alter egos to PSC; PSC_000494; 499, 502; 506; 510; 514; 518 (examples of sale of helicopters on SSI to PSC from various alter ego companies).

[16] G-0355; G-0107; G-0123; G-0302; G-3025; PSC_000477; Exhibit 15 – Jan's Helicopter Sales to PSC; and PSC_001638.

conduct should result in a determination that Walker's likelihood of recidivism is certain and is significantly under-represented by his criminal history category.

Wire fraud is a prototypical example of "serious" conduct considered as a basis for upward departure, and the Ninth Circuit did not hesitate to find that where the defendant pled guilty to wire fraud and subsequently obtained $1,690 through a separate act of wire fraud while awaiting sentencing, the defendant's "post-offense criminal conduct… constitute[d] the strongest possible evidence of a likelihood that she [would] continue to commit similar crimes in the future." *Myers*, 41 F.3d at 533-34 (citing U.S.S.G. § 4A1.3). Walker's post-offense conduct is the *same criminally fraudulent scheme for which he was indicted, tried, and convicted*. "The recidivist's relapse into the same criminal behavior demonstrates his lack of recognition of the gravity of his original wrong, entails greater culpability for the offense with which he is currently charged, and suggests an increased likelihood that the offense will be repeated yet again." *United States v. Montenegro-Rojo*, 908 F.2d 425, 429 (9th Cir. 1990). The quantity or repetitiveness of Walker's post-offense conduct is undeniable. Walker continued to issue the fraudulent leases for helicopters, pilots, and mechanics with fishing companies across the Pacific, thus demonstrating a clear willingness to repeat the crimes he is set to be sentenced for in this action. These post-offense, pre-sentence acts rise to the level of "seriousness" envisioned by the Sentencing Guidelines and Ninth Circuit precedent, especially the continued money laundering (PSC_000016-21; PSC_000522-524; PSC_001114-1121; G-2939-83).

Walker's conduct warrants an upward departure in the form of an increase in Walker's criminal history category from I to at least II,[17] arguably higher due to the sheer number of additional felonies for which he was never charged or convicted, although II brings the Guidelines

[17] Walker's false statements alone, a violation of 18 U.S.C. § 1001, subject him to hundreds of felonious acts from 1990 through 2022. Each one allows the court to add three points to his criminal history.

to 360 to life. The Government respectfully requests that this court clearly articulate the rationale for doing so, utilizing the information described above and further described below. *Montenegro-Rojo*, 908 F.2d at 431; *United States v. Lira-Barraza*, 897 F.2d 981, 986 (9th Cir. 1990).

**C. Application of 18 U.S.C. § 3553 Factors**

The Government incorporates by reference its Sentencing Memorandum, and adds detail to the § 3553 factors below. Additionally, if the Court does not rely on the upward departure arguments, the factors under § 3553 support a maximum sentence of life imprisonment.

1. <u>Complexity and Length of Fraud</u>

Walker's fraudulent activity was sophisticated and complex, with dozens of shell corporations set up in Vanuatu, a venue known for money laundering and other illicit activities due to its remote location and lack of oversight.[18] Walker also registered numerous helicopters in other countries to avoid oversight; then later delisting the aircraft for violation of their own aviation safety laws (cited above in n. 16), demonstrating that Walker respected neither U.S. law nor foreign law.

Walker leased the helicopters to foreign companies and intentionally used airmen unfamiliar with U.S. laws (*e.g.*, G-2900-657; G-2900-791; G-2900-1117; G-2900-1149; G-2900-1502; and G-2900-2628), and purposefully shifted helicopters between shells registered in domestic and international jurisdictions, while bribing officials to obfuscate his criminal conduct and avoid legal consequences (G-0377; G-0645; ECF No. 1917 at 189). Walker even had aircraft simultaneously registered in multiple jurisdictions while others were not registered at all, allowing him to avoid any oversight. (G-0204; G-DA-002).

Walker's 48 alter ego companies formed a complex corporate structure designed to conceal

[18] https://www.fatf-gafi.org/en/publications/High-risk-and-other-monitored-jurisdictions/Apg-statement-vanuatu-october-2015.html

his role as the ultimate beneficiary of his criminal conduct. *See* G-0829; G-0366; PSC_001167 (as compared to PSC_001166). Using this web of sham corporations, Walker successfully defrauded the Government for over 30 years.[19] Walker's shell companies represented themselves as U.S. citizen corporations on the FAA Registry, despite being incorporated in Vanuatu. Although Walker signed most of the registration applications submitted to the FAA, he used shell company names on those registration applications to obscure his ownership and impede the FAA from properly administering its laws and regulations related to safety. *See, e.g.*, G-0752-52 and G-0752-56.[20] Walker used his alter egos to enter into fraudulent lease agreements with at least 55 fishing companies, making numerous misrepresentations upon which the fishing companies relied.[21]

2. Significance of Proceeds from Fraud

The total amount of monetary loss attributable to Walker's criminally fraudulent behavior is staggering. The scope and scale of Walker's operations, which began as early as 1990 and continuing through present, permitted him to accrue, at a minimum, hundreds of millions of dollars in ill-gotten gains. There is substantial evidence for the Court to reasonably conclude that the total

---

[19] Walker's first Bill of Sale filed with the FAA was in 1990, and by 1992, he was purchasing destroyed helicopters (*see* G-1245; G-0326; ECF No. 862 at ¶ 50; and G-1252).

[20] In records obtained from Hansen directly, including its QuickBooks records and countless "schedule of billings and collections" spreadsheets, all tuna boat income was deposited into the Wilma's Flight Services, Inc., account (G-0726), which then moved funds out to other alter egos (G-3061). Bank records showed Caledonian Agency, Inc.'s account was the primary account that received tuna boat income via wire deposits. *See* G-2938. The United States' expert witness Teshara Jones testified that such inconsistencies between what the bank records captured versus what Walker's internal accounting records reflected was also an indicator of fraud, among many others. *See* ECF No. 2044 at 20–21, 165–72, 324, 349–50. The tuna boat leases identified an alter ego shell corporation as the "lessor," yet the helicopters were registered in another alter ego company's name. Despite that, the tuna boat companies wired the lease income into only two bank accounts: Caledonian Agency, Inc. and Wilma's Flight Service Inc., G-3062, because most of the alter egos had no account in which a deposit could be made, just as they had no legitimate business operations.

[21] Specifically, Walker's misrepresentations included those related to: 1) the legitimacy of helicopter registration/serial numbers, *see* G-0586; G-0604; D-115-98; G-2900-1577–1581; G-2900-3629-3633; G-0006; 2) which company served as the owner/operator of the helicopters (G-2900); 3) whether the airmen and mechanics provided were fully qualified and FAA certificated, *see* G-1254; G-1248; and 4) the ability to accurately inspect aircraft for defects within 24 hours of arrival on the boats (which all Government experts said was patently unreasonable and evidence of fraud).

amount of fraud exceeds $400,000,000. *See, e.g.*, G-0366; G-0664; G-1243; G-1244; G-1249; G-1250; and G-2900.[22] The Government's Demonstrative Aid 35 (G-DA-35) provides a helpful summary of the extrapolated income that Walker and his alter egos accumulated from contracts to supply fishing companies with helicopters, mechanics, and pilots.[23]

Walker conceded in the Consent Order of Forfeiture (ECF No. 2237) "to forfeit $58,407,513 in U.S. Currency, representing the proceeds of the aircraft parts fraud and wire fraud offenses, and to forfeit $11,770,000 in U.S. Currency, representing the amount of money involved in the money laundering offenses." ECF No. 2237 at 2. Thus, at a minimum, Walker agreed with the United States that his various criminal schemes resulted in a monetary loss of at least $70,177,513.00, which excludes prior forfeiture admitted by Walker, *see* ECF Nos. 1812 and 1813 ($4,642,897.90 in cash alone), and the value of the hundreds of other assets, easily exceeding $75,000,000 in the aggregate.[24]

After proper calculation, the highest offense level under the guidelines for the grouped counts is found in Count 99, conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. The PSR correctly suggests that U.S.S.G. § 2B1.1 should be used to complete this calculation.

---

[22] The government presented evidence at trial, including bank records (G-1243; G-1244; G-2939), QuickBooks records (G-1249; G-1250; G-1251), tuna fishing contracts (G-2900), and investor solicitation materials (G-0302; G-0366). When averaged, these sources indicate that Walker, via his alter egos, was reaping an average extrapolated annual income of at least $19,669,396.00. When that yearly average is applied across the temporal range of Walker's fraudulent activity preceding the SSI, the resulting amount is $408,310,759.00.

[23] Teshara Jones, the Government's forensic accounting expert, testified at trial about the extent of the fraud and the various indicators that led her to conclude that hundreds of millions of dollars flowed from Walker's criminal conduct. *See* ECF No. 2044 at 120–23, 127–35, 185–87, 234–38, 242–48. Counsel for one of the defendants even admitted in 2020 operations were generating over $12,000,000 in just five months (ECF No. 455-1).

[24] Since Walker already admitted to an amount of loss attributable to his criminal scheme, he "cannot now claim" that his sentence is "inconsistent with the principle announced in Apprendi." Walker's admissions in the Consent Order of Forfeiture, ECF Nos. 1813 and 2237, function as a waiver of his *Apprendi* rights regarding the total amount of loss relevant to his sentencing. Under U.S.S.G. § 2B1.1(b)(1) this amount of loss should result in a 24-point increase in the offense level.

Walker erroneously claims that the specific offense characteristic ("SOC") available under § 2B1.1(b)(1) for the total loss amount should not be considered when calculating the overall offense level for Count 99. *See* ECF No. 2250 at 5–6. Walker vaguely raises the specter of an unconstitutional sentence if the total loss amount SOC is applied, claiming that "[t]he government has not met its burden of proving that a . . . loss increase applies." *Id.* at 6.[25]

3. Use of Uncertificated Airmen

Walker employed pilots and mechanics who were not certified by the FAA (G-1254), yet he falsely represented to tuna boat captains that they were certified. Abundant evidence demonstrates that Walker hired individuals who did not hold FAA-issued pilot certificates to fly his U.S. registered helicopters, *even after he was indicted*! *See, e.g.*, G-1056, G-1057, G-1060 (Marinho, a non-FAA pilot, agreement with alter ego Wilma's, even though he applied to Hansen (G-1122), and then signed another agreement with alter ego Alpha Air falsely stating he was FAA certified (G-1102). Marinho used an aircraft subject to an FAA emergency order of revocation (G-1506) and received his pay through yet another alter ego, PSC (G-1061)).[26]

Walker understood he was violating the law when he used foreign-certified pilots to operate FAA-registered aircraft in nations across the Pacific Ocean.[27] He did it anyway, and he continued

---

[25] Cases following *Apprendi*, which we must assume is the basis for his argument, such as *Booker* and *Blakely*, clearly state that a defendant waives his *Apprendi* rights by entering into agreements with the Government. *United States v. Booker*, 543 U.S. 220, 244 (2005); *Blakely v. Washington*, 542 U.S. 296, 303, 310 (2004). This waiver can stem from guilty pleas, stipulations, consent orders, and other agreements where a defendant admits to certain facts regarding their criminal conduct. For example, in *United States v. Silva*, the Ninth Circuit affirmed a district court's determination that the defendants "waived their right to have a jury determine the amount of methamphetamine that they conspired to distribute." 247 F.3d 1051, 1060 (9th Cir. 2001). The court noted that the defendants admitted in their guilty pleas the specific quantity of methamphetamine involved in the offense, resulting in sentences even exceeding the statutory maximum. *See id.*

[26] *See also* G-0484–G-0515; G-1248 (lists of pilots and mechanics assigned to 31 different helicopters showing employment of individuals holding foreign licenses and certificates).

[27] *See, e.g.*, G-0618 (email from Scott Bachelder to Marvin Reed reporting on meeting where Marshall Islands-based FAA official "brought up a point that Tom Bustos only has a Phillipine [sic] pilot lic[ense]

to do it even after he was convicted. Similarly, Walker's use of uncertified mechanics demonstrates a wanton disregard for laws designed to prevent just the sort of accidents that occurred under his watch. Only FAA-certified aviation mechanics may perform maintenance on U.S.-registered aircraft. *See* 14 C.F.R. § 43.3. Walker held out his mechanics as supervised by himself and others even though they did not personally supervise them. *See* ECF No. 1784. Walker also defrauded the FAA by providing knowingly false information to the FAA to secure an Inspection Authorization mechanic certification for himself to give the *appearance* of his personal oversight of mechanics' work. *See* G-0523; G-1846; and ECF No. 2138.

In service of his crimes, Walker and his criminal co-conspirators fostered a working environment based on fear and silence that punished speaking out about mechanical problems and encouraged taking short cuts. *See, e.g.*, G-0377 (email suggesting they send data plates and N numbers to the RPC's and suggesting they pay $2K to pilots/mechanics to keep their mouth shut); G-1390 (email to mechanic who reported issue with the tail rotor pitch change link ("TRPCL") "unless you . . . have some structural engineering back ground with an emphasis in metal fatigue that I am unaware of and can enlighten me, the pitch link was not the problem . . . . This parts request makes me question your abilities as a mechanic, do not give me cause to question further"); ECF No. 2025 at 30–33 (pilot Bustos testifying that he lost several bonuses and one month's salary for speaking out about mechanical issue concerning the helicopter identified as N1DQ); G-0981, G-1091; PSC_001339.

Walker's use of non-FAA certificated pilots and mechanics fostered a dangerous environment and resulted in dozens of accidents. As Guzzetti testified, "100% of the accidents in which we had information about the certification of the pilot and mechanic, in 100% of the cases

---

and the fact that he was piloting a US reg[istered] aircraft. His only concern was that if the accident was to happen within Majuros (any) jurisdiction this would be a major problem").

either one or both were not FAA certificated." ECF No. 1890 at 353.

4. Use of Counterfeit Parts

Under § 3553, a sentence must afford adequate deterrence and protect the public. Although the Court limited the admission of evidence of other critical counterfeit parts besides the TRPCL,[28] there were, at the time of trial, at least 26 other parts that were critical to the safe operation of the helicopters that were counterfeit (G-0384; G-3038).

Since trial, there have been two more inspections of Walker's operations by the Government – one last year in the Philippines at alter ego Pacific Spotters Corporation's (PSC) facility, and the other at Hansen Helicopter's facility just last month as part of a search and seizure in a related investigation. Dozens more counterfeit parts were found, all manufactured by the same co-defendant who pled guilty to manufacturing counterfeit parts for Walker – Spares, Inc. Exhibit 8 - PSC_001066, Counterfeit parts PSC; ECF No. 1947; G-3078, and Exhibit 9 - Summary Report Guam Search Warrant February 2025.[29] These parts were found in the same space as operable helicopters, and knowing the fraudulent leasing continues, it is clear Walker is undeterred and there remains a continued risk to the public.

---

[28] TRPCLs are a "critical" aircraft part, "the failure of which could have a catastrophic effect upon the rotorcraft." 14 C.F.R. § 29.602 (critical parts for transport category rotorcraft). The catastrophic, predictable effect was simple: the helicopter crashed, without any ability to glide to safety.
Walker, via his position as owner and principal of his shell companies, directed the purchase of counterfeit/unapproved TRPCLs from Spares, Inc., a manufacturer located in Oregon. Walker then directed that these counterfeit TRPCLs be installed on his helicopters and misrepresented them on internal documents, invoices, and purchase orders as legitimate parts. Business records show that the company never purchased legitimate TRPCLs from an industry-approved parts manufacturer. Instead, Walker's employees were uniformly directed to buy and install counterfeit/unapproved parts on helicopters for the purpose of reducing costs, knowing those parts could not be verified as safe. Walker then required pilots and mechanics to "jerryrig" the TRPCLs themselves, despite their having no training, experience, or certification in aircraft maintenance and the unacceptable safety risks associated with such practices. *See* G-1811 and testimony of Bustos (ECF No. 2029), Marinho (ECF No. 2052), and Braga (ECF No. 2042). These practices included placing foreign material through the bearing holes in the TRPCL to maintain the needed friction (G-0888), playing dice with the lives that depended on safe, reliable critical parts.

[29] *See also* testimony of Robert Sprayberry, Randy Breitzman, and Glenda White (ECF Nos. 2074, 2050, and 2055, respectively).

5. Walker's Post-Indictment Criminal Activity

Another factor is the prospect for rehabilitation. With Walker, there is none. Following his initial indictment in May 2018, Walker opened a new business bank account on July 26, 2018, with Community First Guam Federal Credit Union for Limey Air Services, Inc. ("Limey"), a company incorporated in both Guam and Vanuatu, and 99% owned by Walker. *See* G-2939-1-13 and G-2939-72-76. From August 2018 to November 2019, the Limey bank account received incoming wires over $5,000,000.00 from PSC's (alter ego) bank in the Philippines. *See* G-2939-82-83. On or about June 2018, the Bank of Hawaii notified Walker that the corporate bank accounts were closing as a result of the bank's review of the suspicious transaction history. *See* D-132 and D-135. The funds received from PSC were from the continuation of the fraudulent leases, all of which are with Walker's forfeited helicopters, uncertificated airmen, and defrauded clients.[30]

After he was indicted, rather than stopping his scheme, Walker merely moved it to the Philippines, G-3003, and used his alter ego Limey's account to continue to buy counterfeit parts from Spares. *See* ECF No. 1947 at 4–6. Walker (a) incorporated PSC with the Philippine Securities and Exchange Commission (SEC) on or about December 6, 2016, just a few months after the October 2016 FBI search warrant, and (b) Walker updated the corporate filings with the SEC for that company in November 2018, just months after the first indictment, as president, majority owner, and Accountable Manager. *See* G-3003. PSC was found to be yet another alter ego of Walker (ECF No. 1704), and through discovery obtained in the related civil action, it is clear PSC continued the leases involved in the fraud, with the helicopters involved in the fraud, and transferred millions of dollars back to Walker through alter ego Limey. *See* Exhibit 10 –

[30] There is also an affiliation with PSC and alter ego Caledonian Insurance Company as evidenced by PSC_001753 and other evidence.

PSC_001064, Transfers to Limey; and Exhibit 11 - PSC_001166, Transfers to Walker.[31]

Further evidence that the fraud using the same *modus operandi* continued long after indictment is the 2023 import of helicopters used in the scheme back to Guam, Exhibit 12 – Hansen Import of Helicopters from PSC July 2024, identifying PSC as the shipper and exporter, Exhibit 13 – Summary of Imported Helicopters. Hansen Helicopters, convicted in this case, was listed as the consignee. In other words, one of Walker's alter ego corporations was shipping while another alter ego was receiving helicopters used in the fraud. These helicopters, allegedly shipped to Guam for "service," further demonstrate that the fraud is ongoing,[32] and is consistent with evidence that aircraft were usually shipped to Hansen Helicopters in Guam for overhaul. G-0761.[33]

Additional evidence of continued, post-indictment wrongdoing is evidenced by bank transfers between his alter egos, Limey and PSC[34]. Between January 2021 — shortly after the United States filed the SSI with this Court — and April 2023, when the parties were served with the civil injunctive action, **$9,519,555.76** was transferred from PSC to Limey. Walker changed

---

[31] *See* Exhibit 15 – Jan's Helicopter Sales to PSC. Even though Walker de-registered each of his U.S. registered aircraft by February 2021, *see*, *e.g.*, G-0750 (2020) and G-3047 (2021), this Court already noted the existence of substantial evidence showing Walker continued illegally leasing aircraft that had U.S. registration numbers on them even while awaiting trial after indictment, *see* ECF No. 1376 and ECF No. 1521. Evidence of this activity was posted on the social media service Instagram. *See* ECF No. 1422; ECF No. 1521; G-DA-058. This conduct continued after the start of trial, such as when on March 25, 2022, a video was posted to Instagram depicting N1042N, which was registered to Jan's Helicopter Service, Inc., (alter ego) prior to deregistration but which was deregistered from the FAA on September 9, 2020, nonetheless in operation.

[32] Furthermore, the Invoice and Packing List for the four shipping containers identify Walker's nominee Cherry Anne C. Espion ("Cherry Anne") as the PSC point of contact in the Philippines. The helicopter valuation is itself a fraud: $150,000.00 is a fair value only for undamaged helicopters repaired to meet FAA standards. On March 23, 2023, the CAAP responded to a letter that Cherry Anne sent trying to register five of the 12 helicopters identified in the Bill of Lading and Invoice & Packing List with RPC numbers, even though the CAAP still needed to evaluate the application of each aircraft in coordination with the FAA. *See* D-123. This is further evidence that Walker — through alter ego PSC and its nominee - continues to operate the fraud from the Philippines despite the convictions against him.

[33] There were 12 "N" (U.S.) registered helicopters and their serial numbers, including N1042N, N105FM, N584SD, N6188C, N6360S, N66HH, N8315F, and N90176, which sustained substantial damage or were destroyed in prior helicopter crashes. *See* Exhibit 13 – Summary of Imported Helicopters; G-1242-1; G-1247-1; and Exhibit 14 – PSC Helicopters Status as of January 20, 2024.

[34] *See* ECF No. 2027 (withdrawal of Petition by PSC for forfeited helicopters).

bank accounts, so there is no additional information regarding the current location of these funds. All of the funds are from the fraudulent leases and subject to forfeiture.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully requests that this Court enter a sentence of life imprisonment for Defendant Walker. His actions killed 10 people, seriously injured at least eight (8) more, and continued for over 30 years. Walker's actions cost the Government more than $5,000,000 (Exhibit 16 – Costs to FAA and DOT OIG) and a decade of effort, and it still continues today. Nothing short of a life sentence is fair under all of the circumstances.

RESPECTFULLY SUBMITTED this 15th day of May, 2025.

SHAWN N. ANDERSON
United States Attorney
Districts of Guam and the NMI

By: *<u>/s/ Stephen F. Leon Guerrero</u>*
STEPHEN F. LEON GUERRERO
Assistant U.S. Attorney

By: *<u>/s/ Marie L. Miller</u>*
MARIE L. MILLER
Special Assistant U.S. Attorney